# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DEVON T.,                           )
                                    )
                  Plaintiff,        )
                                    )          No. 18 C 7004
        v.                          )
                                    )          Magistrate Judge Schenkier
ANDREW SAUL,                        )
Commissioner of Social Security,    )
                                    )
                  Defendant.        )

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Devon T., moves for reversal and remand of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability benefits (doc. # 13: Pl.'s Mot. For Summ. J., doc. # 14: Pl.'s Mem.). The Commissioner has filed a response brief, asking this Court to affirm the Commissioner's decision (doc. # 24: Def.'s Mot. For Summ. J., doc. # 25: Def.'s Resp.). Plaintiff has filed his reply (doc. # 29: Pl.'s Reply). The matter is fully briefed. For the following reasons, we deny Mr. T.'s motion, grant the Commissioner's motion, and affirm the Commissioner's decision.

## I.

Mr. T. applied for disability insurance benefits ("DIB") on January 8, 2015, alleging an onset date ("AOD") of December 6, 2014 (R. 17, 155). Mr. T.'s date last insured was December 31, 2018 (R. 97, 189). Mr. T.'s claim and subsequent appeal for reconsideration were both denied (R. 17). Shortly thereafter, Mr. T. filed a written request for a hearing in front of an Administrative

---

[1] On February 11, 2019, by consent of the parties and pursuant to 28 U.S.C § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgement (doc. ## 6, 11).

Law Judge ("ALJ") (R. 113-14). Mr. T. and a Vocational Expert ("VE") testified at the hearing which was held on May 2, 2017 (R. 17, 37). On September 5, 2017, the ALJ issued a decision denying Mr. T.'s claim for benefits (R. 28). The Appeals Council declined to review the ALJ's decision, making it the final word from the Commissioner (R. 1-3). *See Varga v. Colvin,* 794 F.3d 809, 813 (7th Cir. 2015); 20 C.F.R. § 404.981.

## II.

Mr. T. was born in 1964 and was 53 years old at the time of the hearing (R. 42, 82). Mr. T. stopped working on December 6, 2014 (R. 193). He suffers from sleep apnea and a nervous condition (*Id.*). He takes the medications methylphenidate to keep him focused during the day and xyrem for sleep apnea, both since December 2012 and prescribed by Dr. Lori E. Lovitz (R. 195, 289). At his most recent job from 2007 to 2014, Mr. T. worked as a porter and pot washer for Aramark Management (R. 211, 285). He alleges he was fired from that job because he could not stay awake due to his disability (R. 193).

At his December 4, 2014 office visit, Dr. Lovitz reiterated Mr. T.'s diagnosis of obstructive sleep apnea on a CPAP and narcolepsy with cataplexy (R. 305). Dr. Lovitz reported that the sodium oxybate worked to help Mr. T. with his sleep and daytime energy but that Mr. T. believed he was more forgetful (*Id.*). Mr. T. had not had an episode of cataplexy (fall) or feelings like he was about to fall for a "long time" (*Id.*). Mr. T. felt refreshed when he woke up in the morning, would sleep seven to eight hours per night and would nap for an hour once per day and would wake up refreshed (*Id.*). Mr. T. scored an 11 out of 24 on the Epworth Sleepness Scale – normal is 11 or below (R. 306). He was originally diagnosed with obstructive sleep apnea on May 2, 2009 and narcolepsy with cataplexy on June 5, 2012 (*Id.*). Dr. Lovitz reported no changes since his last visit, assessed that he had good control of hypersomnolence on methylphenidate and xyrem, and recommended

a follow up visit in one year (R. 306-07). Two days later, on December 6, 2014, Mr. T. stopped working (R. 193).

In his function report dated March 6, 2015, Mr. T. reported that he lived with his wife and step-sons (R. 219). Mr. T. had no issues with his personal care, and he prepared his own meals, cleaned and did laundry (R. 220-21). He used an alarm clock to remind himself to take his medication (R. 221). Mr. T. drove a car and went out alone (R. 222). He shopped in stores, paid bills and handled his money (*Id.*). He spent time with others and exercised daily (R. 223). Mr. T. watched television and sometimes used the computer, although he described himself as unable to focus, falls asleep quickly and forgetful (*Id.*). When he watched television or sat down at a store, he fell asleep – this occurred six to seven times a day (R. 219). He got up and walked around so that he would not fall asleep (*Id.*). Mr. T. claimed his memory and ability to complete tasks were affected by his condition and he was not good at following directions (R. 224).

On April 18, 2015, Mr. T. was seen in the emergency room after passing out (R. 311). The emergency room doctors determined this episode was likely related to his narcolepsy with catoplexy (*Id.*). Two days later, on April 20, 2015, Mr. T. underwent a consultative psychology mental status examination with clinical psychologist Michael E. Stone, Psy. D. (R. 313-16). Dr. Stone opined Mr. T. had no impairments and adequate judgment but was unable to interpret proverbs, he was on the low to average range of intellectual functioning and would not be able to manage benefits on his own (R. 315-16).

Mr. T. returned to see Dr. Lovitz on July 10, 2015 and reported that he restarted xyrem in June with no side effects (R. 379). Just prior to restarting the xyrem, Mr. T. started having "muscle spasms" five to seven times per day due to sleepiness, his legs felt unsteady and like they were going to buckle – he admitted this was often in response to an emotional event (*Id.*). While not on

xyrem, Mr. T. noticed that his eyes rolled back, his tongue got tired, he slurred his words and his head shook (*Id.*). Mr. T. also reported falling asleep for an hour any time he sat down and woke up refreshed (R. 379-80). Mr. T. slept seven to eight hours per night and woke up refreshed (R. 380). He was also biking for exercise (*Id.*). He scored 21 out of 24 on the Epworth Sleepness Scale and reported that he would pull over and take a nap if he got sleepy while driving but that he refrained from driving long distances (R. 380-81). Dr. Lovitz noted no changes since last visit in his medical/surgical update (R. 381). She assessed that Mr. T. started getting worse in May, that the methylphenidate worked really well for him in the past, but he has not been on it because his insurance did not approve it (*Id.*). Dr. Lovitz was working to get it re-approved and increased his other medication (*Id.*).

A day later, in his function report dated July 11, 2015, Mr. T. reported that his condition had worsened (R. 239). He no longer prepared his own meals or did household chores, but he continued to drive a car and was able to go out alone (R. 241-42). Mr. T. also stated that he could not recall where he was at at times (R. 244).

On October 6, 2015, Dr. Lovitz completed a Sleep Disorders Medical Source Statement regarding Mr. T. (R. 385-88). Dr. Lovitz explained that she saw Mr. T. one to two times per year from 2012-2015 and diagnosed him with narcolepsy with cataplexy and obstructive sleep apnea (R. 385). She reported that Mr. T. experiences daytime sleep attacks five times a day that can last as long as one hour and that can occur in hazardous conditions (*Id.*). Dr. Lovitz also stated that Mr. T. could take a nap every time he sits down (*Id.*). She noted that the following various tests were run on Mr. T.: (1) the May 2, 2009 PSG (polysomnography) found mild OSA (obstructive sleep apnea); (2) the May 20, 2009 CPAP titration (overnight sleep study used to calibrate the CPAP); (3) the March 12, 2012 EEG (electroencephalography) results were normal; and (4) the

PSG and MSLT (multiple sleep latency test) on June 4 and 5, 2012 were abnormal, consistent with narcolepsy (R. 386). Dr. Lovitz opined that Mr. T. would need to take unscheduled breaks one to two times per day for 45 minutes to an hour due to his daytime sleep attacks and cataplexy episodes (*Id.*). Dr. Lovitz found that Mr. T.'s impairments would produce good days and bad days and she opined he could miss up to two days per month of work but ultimately stated that Mr. T. is well treated with his medication and he could function every day if he was allowed a nap or two at work (R. 387). Dr. Lovitz also explained that when Mr. T.'s insurance stopped covering his medication, his symptoms worsened (R. 388).

At Mr. T.'s follow-up visit with Dr. Lovitz on January 5, 2016, she increased the dosage of xyrem medication and noted that he should take a nap once a day, every day around 12:00-3:00 p.m. for 30-60 minutes (R. 400).

At Mr. T.'s April 5, 2016 visit with Dr. Lovitz, she noted that when Mr. T. is driving he is fine, but when he sits in the passenger seat he falls asleep (R. 420). He experienced no cataplexy events in the last three months but was still extremely sleepy and fell asleep a lot, particularly at home (*Id.*). Dr. Lovitz stated that Mr. T. was not working, he applied for disability and overall he was "doing better" (*Id.*). Mr. T. scored himself a 24 out of 24 on the Epworth Sleepness Scale (R. 421). Dr. Lovitz assessed that Mr. T.'s severe obstructive sleep apnea was stable on APAP, the narcolepsy with cataplexy improved since he resumed xyrex, and his excessive daytime sleepiness was mainly due to narcolepsy but also sitting around at home a lot (R. 422).

Mr. T. saw Dr. Lovitz on July 19, 2016 and scored 16 out of 24 on the Epworth Sleepness Scale (R. 415). Dr. Lovitz assessed that Mr. T.'s severe obstructive sleep apnea was stable on APAP, the narcolepsy with cataplexy improved since he resumed xyrex, and his excessive daytime sleepiness was mainly due to narcolepsy but also sitting around at home a lot (R. 416).

At the November 10, 2016 visit with Dr. Lovitz, Mr. T. scored 13 out of 24 on the Epworth Sleepness Scale (R. 407-08). Dr. Lovitz assessed Mr. T. with severe obstructive sleep apnea and noted that it was stable on the APAP; his narcolepsy with cataplexy improved once he was back on xyrem but he continued to have severe sleepiness; and his excessive daytime sleepiness was mainly due to narcolepsy but also from sitting around at home (R. 408-09). Dr. Lovitz noted improvement since his last visit (R. 408-09).

At Mr. T.'s follow-up visit on March 21, 2017, he reported an apnea episode the day before where his arms felt numb and he could not move for 30 minutes, although it could have been less time (R. 459). Mr. T. scored 9 out of 24 on the Epworth Sleepness Scale – a normal score that showed continued improvement over the last year (R. 460-61). Dr. Lovitz assessed Mr. T. with severe obstructive sleep apnea that was stable on the APAP; his narcolepsy with cataplexy was stable on xyrem, but he continued to have severe sleepiness; and his excessive daytime sleepiness was mainly due to narcolepsy but also from sitting around at home (R. 461). Dr. Lovitz found that Mr. T.'s daytime sleepiness improved even more, and that the improvement was likely due to exercise (*Id.*).

### III.

At the May 2, 2017 hearing before the ALJ, Mr. T., represented by counsel, testified that he was 57 years old, he went to high school in Jamaica and he could read and write in English (R. 42, 52). He stated that his sleep condition began in 2012 (R. 57). Mr. T. testified that he began seeing Dr. Lovitz in 2012 for his sleep problems (R. 45-46). Mr. T. stated that he takes "day medicines" to prevent him from passing out and he also takes a "night medicine" (R. 46). He testified that even on the medication, if he sits down, he is "going to pass out" (R. 47). He further

testified that sometimes when he is standing "the feeling come into me" and he must sit down to avoid falling (R. 48).

Mr. T. testified that he has not driven a car since 2014, but rather uses the medical van to get around (R. 48-49). Mr. T. stated that he does not go anywhere alone because he sometimes forgets where he is at; his wife goes with him to keep him awake (R. 50). He further testified that the sleep "come[s] onto [him]" two to three times a day but that he has a slight warning before he actually falls asleep involuntarily (R. 52, 56). When he experiences that feeling coming on, Mr. T. testified that he would sit down (R. 57).

Mr. T also testified that in addition to falling asleep during the day, he is also very tired during the day and feels drowsy (R. 63-64). However, he stated that he wakes up in the morning feeling "rested" (R. 64). Because Mr. T. stops breathing in his sleep, he wears a sleep apnea machine (R. 68).

Mr. T. also testified about his employment history. He worked for Air Mark Management Services at Evanston Hospital from 2006 to 2014 as a pot washer and a due porter where he lifted and carried "[a]t least like 30 pounds" (R. 42-43, 63). His responsibilities as a porter included cleaning the tables and stove and mopping the floor (R. 43). Mr. T. testified that he left this job because they "let [him] go" (R. 44). He testified he felt like he was "going to pass out" and needed some sugar for energy because he did not feel good, but his manager thought Mr. T. stopped working and then he was "let ...go" (R. 45).

While employed by Air Mark, Mr. T. testified that he submitted a doctor's note to the human resources department explaining that he needed to take a break in order to take a nap (R. 58-59). Mr. T. started his work day at 6:30 a.m. (R. 65). Mr. T. explained that every day at work he would punch out at 9:30 a.m. for an hour, take his medicine, nap, and return to work (R. 59-

61). Then, at his lunch break, at 1:30 p.m. he would fall asleep again after eating his lunch until someone woke him up when it was time to return to work (R. 65-67). He testified that he woke up disoriented (R. 67). His shift ended at 2:30 p.m. but he worked until 3:30 p.m. to make up for punching out at 9:30 a.m. for the hour nap (R. 68). Mr. T. explained that this arrangement would no longer be effective for him to work because his condition has worsened since 2014 (R. 62, 68).

Mr. T. worked at Home Depot from 2003 to 2005 in the shipping and receiving department (R. 53). Mr. T. testified that his responsibilities included loading and handling the trucks, using a forklift and pushing/pulling the skid and dolly weighing 100 pounds with another person (R. 53-54). Prior to that, Mr. T. testified that he worked at Car Care where he changed the oil and transmission fluids working in the "pit" (R. 54). He would lift between 20 to 40 pounds (R. 55). He testified that he was never a mechanic at a body shop but rather was a lubrication technician at Jiffy Lube (R. 70-71).

During the hearing, the VE testified that Mr. T.'s work at Air Mark as a washer and porter as well as his work as a lubrication technician were medium, unskilled and semi-skilled respectively, as defined and as performed (R. 70-71). His work at Home Depot as a material handler was heavy as defined and performed (R. 71).

The ALJ provided the VE with a number of hypothetical limitations in order to determine Mr. T.'s employment prospects (R. 71-75). The ALJ asked whether work was available for a person with Mr. T.'s closely approaching advanced age; education; English as a second language; full range of work with regard to mental health; no frequent communication in a public setting; severe impairment with regard to sleep issues; full range of work, but environmental restrictions of avoiding unprotected heights, heavy equipment, operating machinery or hazards (R. 71-72).

The VE testified that the individual could perform all the past work except for the material handler position (R. 72). The VE testified that a worker who needs a 30-minute unscheduled break each day in addition to the fixed morning, afternoon and lunch breaks would compromise the availability of past work because it is a "very atypical job accommodation" and is "seldom accommodated" (R. 73). However, the VE testified if the time the individual needed to be off task was consistent with a normal break then the work could be performed because then it is not an accommodation but rather just changing the break time (R. 74). The VE stated there would be some limits and the individual would have to take the break within a certain period of time in coordination with other workers (R. 74). Thus, the VE testified there is still some degree of accommodation and it is not typical (R. 75). Additionally, when the individual is taking unscheduled breaks from work two to three times a day for ten to 30 minutes each every day, the VE testified that is inconsistent with the availability of past work (R. 75). The VE stated that the kitchen helper job is a production environment job, breaks are typically at a scheduled time and taking a break at an unscheduled time is an accommodation (R. 76-77). Typical breaks are 15 minutes in the morning, 30 minutes for the lunch break and 15 minutes in the afternoon (R. 77).

## IV.

On September 5, 2017, the ALJ, following the five-step sequential evaluation process, determined that Mr. T. was not disabled (R. 28). At Step One, the ALJ found that Mr. T. had not engaged in substantial gainful activity since December 6, 2014 (R. 19).

At Step Two, the ALJ found that Mr. T. had three severe impairments: sleep apnea, cataplexy, and narcolepsy (R. 19). At this step, the ALJ also considered Mr. T.'s psychological symptoms and their effect on his functioning and determined Mr. T.'s depressive disorder was

non-severe (R. 20). In doing so, the ALJ considered the paragraph B criteria and determined that they were not satisfied (R. 20-21).

*First*, the ALJ determined that Mr. T. had no limitations in understanding, remembering or applying information (R. 20). The ALJ noted that while Mr. T. alleged that he had difficulty remembering, he stated that he could perform simple maintenance, prepare meals, pay bills, go to doctor's appointments, take medications, shop, drive, and read (*Id.*). The ALJ also gleamed from the record that Mr. T. was able to do such things as provide information about his health, describe his work history, follow instructions, comply with treatment and respond to questions (*Id.*).

*Second*, the ALJ found that Mr. T. had mild limitations in interacting with others (R. 20). Mr. T. alleged he had difficulty engaging in social activities which the ALJ determined corresponded to his chronic sleep issues and resulting functional loss (*Id.*). The ALJ, referencing Mr. T.'s statements, found that Mr. T. was able to get along with others, shop, spend time with friends and family, deal appropriately with authority and live with others (*Id.*). Furthermore, relying on the medical evidence, the ALJ noted Mr. T. had a good rapport with providers, was pleasant and cooperative, had good interactions and appeared comfortable (*Id.*).

*Third*, the ALJ concluded that Mr. T. had mild limitations in concentration, persistence and pace (R. 20). The ALJ noted that Mr. T. claimed he had limitations in concentrating generally and in completing tasks (*Id.*). However, the ALJ also noted that Mr. T. stated he was able to drive, prepare meals, watch television, read, manage funds, use the computer, and handle his medical care (*Id.*). The ALJ also stated that the record failed to show distractibility or an inability to complete testing assessing concentration and attention (*Id.*).

*Fourth*, the ALJ determined that Mr. T. had mild limitations in his ability to adapt or manage himself (R. 20). In doing so, while Mr. T. stated that he had difficulties managing his

mood, he also stated that he was able to handle self-care and personal hygiene and get along with caregivers (*Id.*). Relying on the objective evidence, the ALJ found the record showed Mr. T. had appropriate grooming and hygiene, no problem getting along with others, a normal mood and affect, and no temper control issues (R. 20-21).

Additionally, the ALJ noted that Mr. T. had generally unremarkable mental status examinations, did not regularly treat for his mental impairment and did not require emergency care for it (R. 21). He found Mr. T.'s lack of more frequent medical care to be a "lifestyle choice" and bolstered his finding of no more than mild limitations in any functional areas and thus were non-severe (*Id.*).

Finally, the ALJ gave great weight to the "shared opinion" of the two state agency medical consultants who opined that Mr. T. had no more than mild limitations in any of the Paragraph B criteria (R. 21). The ALJ determined this "well supported" opinion was consistent with the record establishing that Mr. T. did not "regularly treat for his condition" and had unremarkable mental status examinations (*Id.*).

At Step Three, the ALJ determined that Mr. T.'s impairment or combination of impairments did not meet or equal the criteria of an impairment listed in 20 C.F.R. §§404.1520(d), 404.1525 and 404.1526 (R. 21). The ALJ noted that the respiratory listings effective September 29, 2016 eliminated the former sleep related listing disorder at 3.10 and rather directed evaluation under listings for pulmonary hypertension (3.09), heart failure (4.02) and neurocognitive disorders (12.02) and found that Mr. T. did not meet or medically equal any of these listings (*Id.*). The ALJ also concluded that Mr. T. did not meet or medically equal listings 11.02 or 11.03 because he has not had seizures at least once a month or more than once weekly, respectively (R. 22). The ALJ reiterated his conclusion that Mr. T. does not have more than mild limitations in any of the

Paragraph B criteria and he also found that Mr. T. did not have Paragraph C criteria; thus, listing 12.02 was not met (*Id.*).

Before continuing to Step Four, the ALJ reviewed the record and determined that Mr. T. had the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: he cannot work from unprotected heights or around heavy equipment, he cannot operate machinery and must avoid hazards, and he cannot have frequent communication in a public setting (R. 22). In support of his RFC finding, the ALJ stated that Mr. T.'s medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Mr. T.'s statements concerning the intensity, persistence and limiting effects of these symptoms was not entirely consistent with the medical evidence and other evidence in the record (R. 23).

The ALJ relied on the December 4, 2014 report of Dr. Lovitz (two days before his AOD) after a routine check-up for Mr. T.'s narcolepsy, cataplexy, and obstructive sleep apnea (R. 23). Mr. T. had been treated for these conditions for several years prior to his AOD and while he was still working (*Id.*). At this visit, Mr. T. reported his belief that his sleep medication was causing forgetfulness once or twice per week (*Id.*). He was given an Epworth Sleepness Scale assessment – a self-assessment measuring a person's symptoms of sleepiness during the day – to complete (*Id.*). A rating of 11 or less on a scale form zero to 24, is normal (*Id.*). Mr. T. rated his sleepiness at 11 and Dr. Lovitz remarked that Mr. T. had "good control of hypersomnolence" with his medication (*Id.*).

The ALJ found a major inconsistency in Mr. T.'s AOD (R. 23). He explained that Mr. T. did not report to Dr. Lovitz the same level of functional loss as he claimed at the hearing, such as an inability to drive (*Id.*). The ALJ also noted that two days before his AOD Mr. T. rated his

sleepiness at a "normal" level, lacked notable signs of distress, and did not mention his desire to stop work which happened only two days later (*Id.*).

The ALJ also described other records that presented an inconsistent picture of Mr. T.'s functioning compared to his allegations while acknowledging a temporary decrease in his functioning with medication and lifestyle changes (R. 23). The ALJ cited the April 18, 2015 emergency room visit as an example of the inconsistency noting that Mr. T. denied medical transport, worked prior to the episode and had a normal examination at the hospital (*Id.*).

The ALJ acknowledged that for a period of time Mr. T. was unable to take certain medication because of insurance issues (R. 23). And noted that at Mr. T.'s July 10, 2015 appointment with Dr. Lovitz, Mr. T. indicated he stopped taking methylphenidate because his insurance did not approve it (*Id.*). Mr. T. then reported muscle spasms, issues with walking, slurred speech, auditory hallucinations, and falling asleep often when in a chair after stopping the medication (R. 24). The ALJ noted that Mr. T. also reported an increase in sleepiness but he was also able to ride a bike for exercise and was averaging more than eight hours of sleep (*Id.*). The ALJ also acknowledged that Dr. Lovitz described the methylphenidate as working "really well" to control his sleep patterns and she was working to get it approved through his insurance (*Id.*).

The ALJ discussed that Mr. T. began taking methylphenidate again and by April 5, 2016 he was doing better overall but still falling asleep "a lot" particularly at home (R. 24). The ALJ relied on Mr. T.'s statements that he was napping three times per week and would nap three to four times a day while watching television (*Id.*). His naps were refreshing, he was fine driving, but he would fall asleep as a passenger (*Id.*). The ALJ relied on Dr. Lovitz's notes that Mr. T. was not working and that she attributed some of his symptoms to "sitting around at home a lot" (*Id.*). He also relied on Dr. Lovitz's assessment of the data from Mr. T.'s CPAP machine showing that Mr.

13

T. had an apnea/hypopnea index of 8.9 – mild apnea on the Respiratory Arousal Index scale; where as Mr. T. rated his sleepiness at 24 out of 24 (*Id.*).

The ALJ noted that by July 19, 2016, Mr. T. was napping only once per day for an hour if watching television and rated his sleepiness at 16 out of 24 (R. 24). By November 10, 2016, the ALJ remarked that Mr. T.'s sleepiness rating improved to 13 out of 24 and by March 21, 2017 it was nine out of 24 and thus within normal limits (*Id.*). However, Mr. T. stated that he was experiencing sleep disturbances three nights per week and that he "nods off" while watching television (*Id.*). But Mr. T. also stated his sleep was refreshing and Dr. Lovitz continued to attribute some of Mr. T.'s sleepiness to his choice to stay inactive and watch television (*Id.*).

The ALJ then explained why he found that Mr. T.'s allegations of the nature, intensity, persistence, and limiting effects of his symptoms were not consistent with the medical signs, laboratory findings or other evidence (R. 24). *First*, the ALJ found that Mr. T.'s described daily activities were not limited because while he lives with his wife he is able to live independently, he can handle his personal care needs, cooks, cleans, shops, and drives independently with some restrictions (*Id.*). *Second*, Mr. T.'s treatment was assessed by the ALJ as conservative and his medication type, dosage, effectiveness and side effects did not result in significant limitations (R. 25). Furthermore, the ALJ found that Mr. T.'s reported forgetfulness from his sleep medication would not result in greater limitations than already accounted for in the RFC (*Id.*).

Finally, the ALJ found that Mr. T.'s allegations of disability were not consistent with the evidence of the record because Mr. T. did not report to his medical provider the same specific work-related functional loss as he asserted at the hearing or in his disability filings (R. 25). The ALJ offered as examples: (1) Mr. T. testified he stopped driving in 2014 due to worsening symptoms but indicated several times in his medical records and disability findings that he

continued to drive after 2014, (2) Mr. T. testified he randomly fell asleep during the day and could

not stop it from happening, but also drove a car, rode a bicycle and lifted weights, and (3) Mr. T.

stated he did not feel refreshed when he woke up but the medical evidence notes stated the opposite

(*Id.*). Further, the ALJ found that Mr. T. improved during the period of review and his symptoms

were likely worse while he had worked (*Id.*). Thus, the ALJ concluded that because Mr. T. was

able to manage his symptoms prior to his AOD and they have improved since then, greater

limitations were not supported (*Id.*).

Next, the ALJ reviewed the opinion of Lenore Gonzalez, M.D., the state agency consultant

at the reconsideration level, and awarded it substantial weight (R. 25). The ALJ reasoned that Dr.

Gonzalez assessed Mr. T. to have many of the same non-exertional limits as discussed in his RFC

(*Id.*). Additionally, her opinion was consistent with the record of less frequent and intense

symptoms than alleged, the medical records showed Mr. T.'s symptoms were exacerbated in part

by "lifestyle choices rather than other reasons outside of his control," and her opinion was well

supported as she cited to multiple portions of the medical record (*Id.*).

The ALJ also reviewed the opinion of Mr. T.'s treating physician, Dr. Lovitz, and assessed

it minimal weight (R. 26). He first summarized Dr. Lovitz's findings of Mr. T.'s limitations as

follows: need to get up after sitting for one hour, need to take up to two naps per day for up to 60

minutes each, need to miss up to two days of work per month (*Id.*). The ALJ then remarked that

Dr. Lovitz's opinion was that Mr. T. was able to work if he was medicated and allowed to take a

nap or two at work (*Id.*).

The ALJ discussed the treating physician rule and did not give Dr. Lovitz's opinion

controlling weight because substantial evidence existed that was inconsistent with the opinion (R.

26). In support, the ALJ reiterated Mr. T.'s sleepiness rate at a normal level, completion of personal

care activities, working during period of review, and Dr. Lovitz's notes indicating Mr. T.'s naps were due in part to lifestyle choices (*Id.*).[2]

After evaluating Dr. Lovitz's opinion based on the six treating physician rule factors, the ALJ granted it minimal weight (R. 26). The ALJ determined Dr. Lovitz did not have many opportunities to observe Mr. T.'s functioning because she only treated him twice per year (*Id.*). Additionally, the nature and duration of Dr. Lovitz's treating relationship with Mr. T. added little to her understanding of his daily activities because she based her treatment and opinion on Mr. T.'s statements rather than objective findings and, despite the fact that she treated him for years, she only saw him a handful of times (*Id.*). The ALJ found that the medical evidence was inconsistent with the opinion as well because Mr. T. had low or mild ratings in sleep study tests and rated his sleepiness at normal levels at the beginning and end of the timeframe (*Id.*). Furthermore, the ALJ stated that Dr. Lovitz's opinion failed to reconcile the level of work limitations he ascribed to Mr. T. and these simultaneously benign findings (*Id.*). The ALJ also determined that Dr. Lovitz's specialization in sleep disorders did not "make her better" at assessing Mr. T.'s need to nap because she used incomplete data and subjective information (R. 26-27). Last, the ALJ discussed the inconsistencies from the hearing concerning Mr. T.'s symptoms, ability to drive and reason for stopping work, which support that Mr. T. was not as limited as Dr. Lovitz concluded (R. 27).

The ALJ found at Step Four that Mr. T. was capable of performing past relevant work because the work did not require the performance of work-related activities precluded by the RFC and thus concluded that Mr. T. could perform the kitchen helper position (R. 27). Thus, the ALJ determined that Mr. T. was not disabled (R. 27-28).

---

[2] The ALJ mentioned that Mr. T. may have worked as a mechanic during the review period – this is not the case, but in light of the other reasons the ALJ gave for his conclusions, that error is harmless.

## V.

We review the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is a standard that "requires more than a mere scintilla of proof and instead such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walker v. Berryhill,* 900 F.3d 479, 482 (7th Cir. 2018) (internal quotation marks and citation omitted). Mr. T. makes three arguments in favor of remand: (1) the ALJ erred in evaluating the medical source opinions of record; (2) the ALJ did not properly evaluate plaintiff's RFC under SSR 96-8P; and (3) the ALJ erred in evaluating the plaintiff's subjective allegations according to SSR 16-3P (Pl.'s Mem. at 3-11).

## A.

Mr. T. argues that the ALJ erred in evaluating the medical source opinions of treating physician, Dr. Lovitz and state agency medical consultant, Dr. Gonzalez. We address the arguments with regard to Dr. Lovitz first.

## 1.

"A treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and is consistent with other evidence in the record." *Gerstner v. Berryhill,* 879 F.3d 257, 261 (7th Cir. 2018); *see* 20 C.F.R. § 404.1527(c)(2); *Lambert v. Berryhill,* 896 F.3d 768, 774 (7th Cir. 2018).[3] When an ALJ does not give controlling weight to a treating physician's opinion, he must then evaluate the opinion by following the factors outlined in 20 C.F.R. §404.1527(c)(2)-(6). These factors include: length of the treatment relationship and the frequency of examination; nature and extent of the treatment

---

[3] The treating-physician rule has been modified to eliminate the "controlling weight" instruction for claims filed after March 27, 2017, but the previous rule applies to Mr. T.'s claim which was filed prior to that date. *See Gerstner,* 879 F.3d at 261.

relationship; supportability; consistency; specialization; and other factors. *Knapp v. Berryhill*, 741
Fed. Appx. 324, 327-28 (7th Cir. 2018); *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010).
The ALJ may not disregard the opinion of a treating physician without offering "a good reason."
*Walker,* 900 F.3d at 485. However, as long as the ALJ considers these factors and minimally
articulates the reasons, the decision will be upheld. *Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir.
2008). The ALJ adequately supported his decision to give minimal weight to Mr. T.'s treating
doctor.

The ALJ did not give controlling weight to Dr. Lovitz's opinion because there was
substantial evidence that was inconsistent with the opinion (R. 26). In doing so, the ALJ referenced
Mr. T.'s own self-assessments and his inconsistent endorsements of symptom frequency and
intensity as inconsistent with Dr. Lovitz's opinion (*Id.*). The ALJ also noted the normal level of
sleepiness at the beginning of the review period, and Mr. T.'s ability to complete his personal care,
cook, shop, clean, drive, and exercise (*Id.*). The ALJ also relied on Dr. Lovitz's treatment notes
that some of Mr. T.'s need for napping was due in part to his lifestyle choices of staying at home
and being inactive (*Id.*).

The ALJ then reviewed the factors outlined in 20 C.F.R. §404.1527(c)(2)-(6) and assigned
Dr. Lovtz's opinion minimal weight (R. 26). In doing so, the ALJ considered the following: Dr.
Lovitz's status as a treating physician; that Dr. Lovitz treated Mr. T. twice per year – only a handful
of times – and discussed the lack of opportunities to observe his functioning; Dr. Lovitz's basis of
her treatment and opinion was on Mr. T.'s statements rather than objective findings; the medical
evidence was inconsistent with Dr. Lovitz's opinion because Mr. T. had low or mild ratings in
various sleep study tests and he rated his sleepiness at normal levels at the beginning and end of
the review period; Dr. Lovitz's opinion did not explain why Mr. T. had work preclusive limitations

but simultaneous benign findings; Dr. Lovitz's specialty in sleep disorders did not make her better at assessing Mr. T.'s need for naps especially since she used incomplete data and subjective information; the inconsistencies in Mr. T.'s testimony regarding the frequency and intensity of his symptoms, his ability to drive (he testified he stopped driving in 2014 but that was inconsistent with his reports to the agency in May and June 2015 and to Dr. Lovitz in 2016); his reasons for stopping work; and other factors that each support that Mr. T. was not as limited as Dr. Lovitz determined.

Elsewhere in his opinion, the ALJ explained that Mr. T. reported higher sleepiness during the time period when he was unable to get methylphenidate due to insurance issues, which according to Dr. Lovitz worked "really well" in controlling his sleepiness patterns (R. 23-24). By March 2017, the ALJ noted that Mr. T. rated his sleepiness at a normal level (R. 23-24). The ALJ also pointed to Dr. Lovitz's treatments notes that attributed some of Mr. T.'s sleepiness due in part to his sedentary and lifestyle choices (R. 24, 26).

Mr. T. argues that he was diagnosed with mild sleepiness in November 2016, moderate sleepiness in July 2016, and severe sleepiness in July 2015 and April 2016 (Pl.'s Reply at 2). However, taken in chronological order, his severe sleepiness occurred in July 2015 when he was off his medication into April 2016. After he resumed his medication his sleepiness improved to moderate in July 2016 and by November 2016 was mild. Mr. T. also claims Dr. Lovitz's opinion was consistent with objective evidence of four tests taken in 2009 and 2012, all while Mr. T. was working (Pl.'s Reply at 2). Mr. T. mentions the names and dates of the tests but neglects to share the results. The May 2, 2019 polysomnogram ("PSG") showed only mild obstructive sleep apnea; the May 20, 2009 CPAP exam was merely a sleep study to configure the CPAP; the March 12, 2012 EEG was normal; and the multi-day June 2012 PSG supported narcolepsy (R. 386).

Therefore, the objective evidence supports the ALJ's assessment. The ALJ reasonably gave minimal weight to Dr. Lovitz's opinions concerning greater limitations to the extent these limitations were based on only Mr. T.'s subjective reports of his symptoms. *See Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013).

We find that the ALJ "minimally articulated" his reasons for declining to give Dr. Lovitz's opinion controlling weight, and also that he adequately supported his reasons for granting that opinion minimal weight.

## 2.

Mr. T. next contends that the ALJ erred in evaluating the opinion of state agency medical consultant, Dr. Gonzalez. Dr. Gonzalez assessed that Mr. T. could frequently climb ladders, ropes and scaffolds; should avoid concentrated exposure to hazards; and had no other limitations (R. 95-96). The ALJ afforded Dr. Gonzalez's opinion substantial weight because it was "consistent with the record," which established that Mr. T. had less frequent and less intense symptoms than alleged (R. 25).

Mr. T. takes issue with Dr. Gonzalez citing a hospital visit and procedure unrelated to Mr. T.'s sleeping disorder and an "old" treatment note from December 2014 (Pl.'s Mem. at 3). We find no merit in that criticism. Dr. Gonzalez thoroughly reviewed the medical record before him, which contained these materials. The treatment note from December 2014 can hardly be considered "old" as it is dated December 4, 2014 – a mere two days prior to Mr. T.'s AOD of December 6, 2014 (R. 17, 298-309). At that visit, Dr. Lovitz reported no changes since Mr. T.'s last visit; she reported that Mr. T. scored at the "normal" level in the Epworth Sleepness scale, assessed that he had good control of hypersomnolence on methylphenidate and xyrem, and recommended a follow up visit in one year (R. 306-07).

Next, Mr. T. takes issue with the ALJ failing to articulate the contradiction between Mr. T.'s belief that Dr. Gonzalez opined that Mr. T.'s sleep apnea, cataplexy, and narcolepsy were non-severe while the ALJ found the impairments to be severe (Pl.'s Mem. at 4). Dr. Gonzalez did reference Mr. T.'s sleep apnea and narcolepsy with cataplexy in her report and noted that Mr. T.'s conditions were controlled while on methylphenidate and xyrem and that he was not having cataplexy (R. 97). The ALJ found Dr. Gonzalez's opinion was well supported, as he cited multiple portions of the medical record to support his conclusions (R. 25). Ultimately, the ALJ's decision that these impairments were severe was more advantageous to Mr. T.

Mr. T. also challenges Dr. Gonzalez's opinion because it was written on August 25, 2015, more than two years before the date of the ALJ's opinion (Pl.'s Mem. at 4). However, State agency decisions often come at the initial and reconsideration stages, which significantly predate the ALJ's decision. Mr. T. relies on cases finding that ALJ's may not rely on outdated opinions of agency consultants if the later evidence contained new and significant medical diagnoses that reasonably could have changed the reviewing physician's opinion. *See Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018). Mr. T. claims Dr. Gonzalez did not review Mr. T.'s sleep studies and sleepiness assessments. Unlike in *Lambert* where the reviewing physician's opinion pre-dated surgeries and other degradation in pain, here, by the end of the reviewing period, the ALJ pointed out that Mr. T.'s sleepiness rating was normal on the Epworth Sleepness Scale and Dr. Lovitz indicated improvement since Mr. T. resumed his medication. Thus, there was no new or significant medical diagnoses that could have reasonably changed the reviewing physician's opinion. And, Dr. Lovitz's October 2015 opinion was rendered a mere two months after Dr. Gonzalez's opinion, making it no more "stale" than a Dr. Lovitz report on which Mr. T. seeks to rely.

Mr. T. also argues that the ALJ did not address whether Dr. Gonzalez, a pediatrician, had any specialized training in treating adults, particularly those with Mr. T.'s condition, while Dr. Lovitz, Mr. T.'s treating physician, specialized in sleep conditions (Pl.'s Mem. at 5). Specialization is just one of the many factors ALJs consider in determining how to weigh the medical opinions 20 C.F.R. § 404.1527(c)(5). And these factors are not required to be weighed equally. Mr. T. cites *Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017), for the proposition that a "treating physician's opinion trumps the conclusions of agency consultants—in particular those who never examined the claimant—unless the limitations articulated by the treating physician are not supported by the record." As discussed above, the ALJ reasonably found that Dr. Lovitz's limitations were not supported by the record; therefore, Dr. Lovitz's opinion does not "trump" Dr. Gonzalez's opinion in this matter. Moreover, the opinion of a non-examining state agency consultant is the type of medical evidence an ALJ may rely upon to craft a claimant's RFC. *See Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004); *Mason v. Colvin*, No. 13 C 2993, 2014 WL 5475480, at *7 (N.D. Ill. Oct. 29, 2014); *see also* 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1) (requiring ALJs to consider evidence from agency consultants because these consultants "are highly qualified and experts in Social Security disability evaluation").

**B.**

Mr. T. next argues that the ALJ did not properly evaluate his RFC capacity under SSR 96-8P, 1996 WL 374184, because the ALJ could not have reasonably relied on Dr. Gonzalez's opinion in formulating the RFC (Pl.'s Mem. at 10). Mr. T. claims the RFC limitation did not account for off-task time related to a narcoleptic episode, and relies on (1) his own testimony that he would need to sit down when an episode was about to happen to avoid injury, he would pass out two to three times a day, he had a doctor's note stating he needed daily naps, and (2) Dr. Lovitz's

statement that he had daily one-hour naps (Pl.'s Mem. at 10-11). However, Mr. T. only relied upon his subjective testimony and statements to his doctor in support of his self-assessment. The ALJ, as well as Dr. Lovitz and Dr. Gonzalez, all found that Mr. T.'s sleepiness diminished after he resumed his medication and the record suggested he was not having cataplexy while on the medication (R. 97). The ALJ thoroughly reviewed the record, described numerous inconsistencies concerning for example Mr. T.'s AOD and testimony versus statements to his doctor and assessed a more limited RFC then Dr. Gonzalez considering Mr. T.'s impairments. The ALJ's analysis of Mr. T.'s RFC was sufficiently based on the record to withstand challenge.

## C.

Mr. T. challenged the ALJ's assessment of his alleged symptoms under SSR 16-3p. SSR 16-3p defines "a symptom as the individual's own description or statement of his or her physical or mental impairment(s)." SSR 16-3p, 2016 WL 1119029, at *2 (Mar. 16, 2016). An ALJ must "evaluate the intensity and persistence of an individual's symptoms" so she can determine how those symptoms limit the individual's "ability to perform work-related activities." *Id.* We will overturn this evaluation, which we refer to as the ALJ's subjective symptom assessment, only if it "is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). Because the ALJ is "in the best position to see and hear the witnesses and assess their forthrightness," this standard is "extremely deferential." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The claimant bears the burden of demonstrating that an ALJ's subjective symptom assessment is "patently wrong." *See Horr v. Berryhill*, 743 F. App'x 16, 20 (7th Cir. 2018); *Joe R. v. Berryhill*, 363 F. Supp. 3d 876, 884 (N.D. Ill. 2019).

Mr. T. begins by taking issue with the ALJ's conclusion that Mr. T.'s symptoms were "not entirely consistent" with the medical evidence. This argument fails. "The Seventh Circuit has criticized statements by ALJs that claimants are 'not fully credible' -- or, in this case, 'not entirely consistent' -- but nevertheless has upheld credibility findings using these phrases where the ALJ otherwise adequately justified the determination." *Kuhn v. Berryhill*, No. 17 C 6454, 2019 WL 1172988, *8 (N.D. Ill. Mar. 13, 2019) *citing Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018). Here, we find the ALJ adequately justified his determination.

The overarching theme of Mr. T.'s argument is that the ALJ failed to consider that his symptoms waxed and waned. However, Mr. T.'s argument is undermined by his failure to even mention that the time period when his sleepiness was uncontrolled coincided with his inability – since rectified – to get his medication because of insurance issues. When Mr. T. resumed the medication, he saw consistent improvement all the way to a normal sleep rating. Mr. T. completely ignored his improvement while medicated in either of his briefs to this Court. Indeed, while Dr. Lovitz acknowledged Mr. T. could have good days and bad days, she also acknowledged his improvement on medication.

Keeping in mind Mr. T.'s lack of reference to his own normal sleep rating after resuming his medication, we turn to Mr. T.'s arguments. *First*, Mr. T. challenges the ALJ's finding that Mr. T.'s allegations were not completely consistent with the record, because Mr. T. "did not endorse having the same level of functional loss to Dr. Lovitz as he did at the hearing, such as the ability to drive" (Pl.'s Mem. at 12, quoting R. 23). Mr. T. says his hearing testimony that he has not driven a car "since 2014" was not inconsistent with prior statements that he could drive, because taking the medical van was not inconsistent with being capable of driving but refraining from doing so (Pl.'s Mem. at 12; R. 48). But, Mr. T. told the agency that he actually drove in the March and July

2015 function reports and told Dr. Lovitz in April 2016 that he was "fine" when driving but fell asleep if he sat in the passenger seat (R. 24-25, 222, 242, 420). Thus, the ALJ was not "patently wrong" in his assessment of Mr. T.'s inconsistent statements.

*Second*, Mr. T. addresses the ALJ's finding that Mr. T.'s statements were inconsistent with the record because he "rated his sleepiness at a normal level" and argues that Mr. T.'s symptoms wax and wane (Pl.'s Mem. at 12 quoting R. 23). We refer back to the central theme that Mr. T.'s sleepiness was well-controlled while on medication and was briefly uncontrolled only when he was unable to get his medication. This point is well supported by the ALJ.

*Third*, Mr. T. addresses the ALJ's finding that Mr. T. stopped working in part for non-disability reasons (Pl.'s Mem. at 13). The ALJ discussed the major inconsistency of Mr. T.'s AOD, just two days after his visit with Dr. Lovitz in December 2014 wherein he "mentioned nothing of his desire to stop work" (R. 23). In that visit, Dr. Lovitz characterized him as having "good control of hypersomnolence" with his medication and Mr. T. rated his sleepiness as normal (R. 306).

Finally, Mr. T. faults the ALJ's analysis of Mr. T.'s activities of daily living (Pl.'s Mem. at 14; R. 25). ALJs may consider daily activities in their analysis of subjective symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(i). While the Seventh Circuit has "cautioned ALJs not to equate … activities with the rigorous demands of the workplace … it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of his impairments was credible or exaggerated." *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) (citation and internal quotations omitted). Here, the ALJ adequately provided explanation and support in his finding noting the inconsistencies in Mr. T's testimony regarding his driving, and other physical activities such as biking and lifting weights almost every day with his allegation that he could fall asleep at any time and cause himself injury. Mr. T. explained to

Dr. Lovitz that he was fine driving but would fall asleep in the passenger seat. Furthermore, Dr. Lovitz attributed some of his sleepiness to Mr. T.'s choice to remain sedentary and live a stay-at-home lifestyle. The ALJ's assessment of Mr. T.'s symptoms was not patently wrong.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment (doc. # 13) is denied and defendant's motion for summary judgment (doc. #24) is granted. We affirm the Commissioner's decision. The case is terminated.

**ENTER:**

_____
**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**


**DATED:  January 30, 2020**